**CARPENTER INTERNATIONAL, INC., Plaintiff,**

v.

**KAISER JAMAICA CORP. et al., Defendants.**

**Civ. A. No. 4352.**

United States District Court, D. Delaware.

April 10, 1975.

See also, D.C., 369 F.Supp. 1138.

Murdoch & Walsh, P. A., Wilmington, Del. and James T. Lewis of Lewis, Mitchell & Moore, Vienna, Va., for plaintiff.

Charles F. Richards, Jr. and Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

LATCHUM, Chief Judge.

Plaintiff, Carpenter International, Inc. ("Carpenter Int'l"), a Texas corporation having its principal place of business in Texas, seeks to recover a total of $534,942.38 from the defendants, Kaiser Jamaica Corp., Reynolds Jamaica Aluminum, Ltd. and Anaconda Jamaica, Inc., each a Delaware corporation having a principal place of business in a state other than Texas, and each a partner in Alumina Partners of Jamaica ("Alpart"), for an alleged breach of a concrete construction contract which Carpenter Int'l had entered into with Alpart. Jurisdiction of this court is asserted under 28 U.S.C. § 1332.

The defendants first moved for summary judgment pursuant to Rule 56, F.R.Civ.P., on the grounds that a release executed by the plaintiff bars the present action. The plaintiff also moved for summary judgment to strike as insufficient at law the defense that the present action is barred by the proffered release. Both motions were denied. Carpenter International, Inc. v. Kaiser Jamaica Corp., 369 F.Supp. 1138 (D.Del.

1974). Defendants thereafter moved pursuant to Rule 42(b), F.R.Civ.P., for a separate trial of the issue of the validity, enforceability and effect of the release executed by the plaintiff.[1] This motion was granted[2] and the issue as to the effect of the release was tried by the Court without a jury on January 6, 1975. The Court, having considered the testimony and evidence adduced at trial, makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

By 1969 construction had been completed on the defendants' 950,000 ton alumina plant located in Nain, Jamaica. (Trial transcript, Tr. 7). Kaiser Engineers ("Kaiser") performed the engineering and construction management for the defendants. (Tr. 7). Thereafter, Kaiser entered into another contract to provide the defendants with detailed engineering and construction management on an expansion project to increase the capacity of the Nain alumina plant from 950,000 to 1,350,000 tons. (Tr. 7-8).

On June 24, 1970 the plaintiff contracted with the defendants to perform certain concrete construction work in connection with the expansion project. (Tr. 7; Docket Item 1, par. 6; Docket Item 5, par. 6). That contract provided that the plaintiff was to receive ninety percent of the value of work completed on a monthly basis, the remaining ten percent was to be withheld as "retention money." (Defendant's Exhibit, DX 19; Tr. 9, 49). Exhibit C, par. 23 E of the contract also provided:

"As conditions precedent to final payment under this Contract, Contractor shall execute a written general release of all claims against Owner and Engineer and their property, agents and employees arising under or in any way connected with this Contract, and Owner may further require Contractor to furnish written general releases and waivers of all claims by Contractor or any and all subcontractors, assignees, vendors or others furnishing labor, materials, services, or equipment in connection with Contractor's performance of this Contract." (DX 19).

In addition the plaintiff had no control under the contract over the wages paid to the union labor used because these wages were set by an island-wide agreement which was scheduled to expire in November 1970. (Tr. 23, 108–09).

The cast of personalities needed to understand the background of this suit include: A. R. Gill ("Gill") defendants' representative who was located in Oakland, California (Tr. 10–11); Richard W. Hart ("Hart") Kaiser's project manager for the Jamaica expansion project who reported to Gill (Tr. 10, 40–41); Douglas A. Robertson ("Robertson"), plaintiff's project manager who was located at the project site and who had frequent contact with Hart (Tr. 12–13, 16; DX 1, 18), and Robert D. Carpenter ("Carpenter") president of the plaintiff who was located in Dallas, Texas. (Tr. 106, 121).

### A. *Conduct Before Release Was Signed.*

In performing its contract on the Jamaica expansion project, the plaintiff claimed it lost a considerable amount of money. (Tr. 111, 146; Plaintiff Exhibit PX 5). As a consequence, Carpenter attempted to secure for the plaintiff a percentage of the retention money by a letter dated February 26, 1971. (Tr. 146–47; DX 1). In response to this attempt, Robertson was verbally advised by Hart that the defendants would not release any retention money until the contract had been completely performed. (Tr. 9).

In a second letter dated February 26, 1971 the plaintiff declined an invitation by Kaiser to submit a competitive bid on additional work because of alleged low

1. Docket Item 22.　　　　2. Docket Item 24.

productivity of the labor force supplied to the plaintiff under the expansion project contract. (DX 2; Tr. 9).

By a telex dated March 30, 1971 Gill was warned by Hart that the plaintiff might be laying a basis for a claim for losses due to low productivity of the labor force. (PX 9). Hart based his warning on the plaintiff's day-to-day activity at the project site and on the refusal of the plaintiff to bid on additional work. Hart also advised Gill that the plaintiff had turned the administration of its contract over to Kenneth L. Sipes, Jr. ("Sipes") who was plaintiff's "claim expert." (Tr. 85–86, PX 9). Hart was not particularly concerned since he believed "our contract documentation is in excellent shape." (PX 9).

In April 1971 as the expansion project neared completion, a strict policy directive was sent from Gill to Hart that no retention money would be paid out by the defendants unless a contractor provided a full release from all claims except for the wage escalation and specific insurance claims. (Tr. 42; DX 3). This policy was instituted to discourage contractors from "dribbling in" with claims many months after their work was completed. (DX 3; Tr. 11). Hart made Gill's views known to the plaintiff through Robertson and to all the other subcontractors on the project. (Tr. 12).

Events leading to this suit began to unfold rapidly in May 1971 when island-wide labor negotiations resulted in a new labor contract to replace the prior contract which had expired in November 1970. Hart was one of the Kaiser men to sign the new agreement. (Tr. 58). The new agreement provided for a wage escalation retroactive to November 1970 which was to be paid by June 11, 1971. (Tr. 58–60). Although the plaintiff played no part in the negotiations, it was obligated under its contract to make the wage escalation payments to its union laborers (Tr. 67, 73, 125, 132, 150) and only after the plaintiff had made the payments and presented verified

proof of payment to the defendants would it be reimbursed. (Tr. 23, 65). By this point in time the plaintiff's work on the project was substantially completed. (Tr. 110).

Shortly thereafter three letters were sent by the plaintiff to Kaiser. By letter dated June 1, 1971, Carpenter reminded Hart of plaintiff's "need to secure some relief" from the economic losses allegedly incurred under the contract. (DX 5). In this letter Carpenter refers to a suggestion by Hart that relief could possibly be obtained through additional work, but that now no such offer for work was forthcoming. After reviewing the history of the contract on the expansion project, Carpenter closed the letter by stating:

"In summary, we feel that possibly honest mistakes were made by both companies; however, we have completed our work on time and have filed no claims to date, even though we have experienced unwarranted and unanticipated costs over those verified in our meeting on 1 June 1970. There is no question that the owners have received a genuine bargain; however, it has been gained at the sole expense of our small company. As soon as possible, we need to establish a meeting with the appropriate parties to discuss some relief or means whereby our company can at least be reimbursed for the actual costs (all costs are available for your review) through contract adjustment or future work. Please advise us of the names of the owner's representatives who have control over expenditures on this project and, also, when and where a conference may be held to discuss these matters." (DX 5).

In a second letter dated June 8, 1971, Robertson wrote to Hart requesting that the retention money be released immediately:

"As you are aware, we are within days of completing Contract No.

6942–0026 and you are holding retention monies in the amount of one hundred thousand, five hundred and ninety-nine dollars sixty-eight cents (US$100,599.68).

"Since we are due and entitled to this amount under the Contract, we request that the full amount of said retention monies, or a considerable portion thereof, be released to us immediately.

"As we have always operated in co-operation with you, we respectfully request that this matter be given your favourable consideration." (DX 4).

In a third letter also dated June 8, 1971, Sipes (plaintiff's claims expert) wrote Hart[3] requesting that the retention money be released to plaintiff. (DX 8). Sipes included with his letter a "Release and Waiver of Lien" form which was signed by Daniel J. Shea ("Shea"), executive vice president of the plaintiff. This release contained the following pertinent language:

"In consideration of the past payment by Kaiser Engineers Americas, Inc. (hereinafter called 'Engineer') acting as agent for the Owner, Alumina Partners of Jamaica, of $875,714.40, receipt of which is hereby acknowledged, and in consideration of $132,960.55 to be paid by Engineer, acting as agent for the Owner to Carpenter International, Inc. (hereinafter called 'Contractor') and for other good and valuable consideration and in accordance with the Terms and Conditions of Contract No. 6942–0026 between Owner and Contractor dated as of 24 June 1970, as changed or amended through Change Order 'I,' Contractor hereby releases Owner and Engineer, their directors, officers, agents and employees and property from any and all claims arising directly or indirectly under said Contract, as amended including Field Transmittal Memoranda numbered 1 through 87,

except for the following claims which are hereby expressly reserved:

> Wage Escalation per Exhibit 'G'
> Any and all insurance claims."

(DX 9).

During the first two weeks in June 1971, Hart was also informed by Carpenter that because plaintiff had lost so much money on the expansion project, only two sources were left from which to pay the wage escalation payments: defendants could make an advance payment concurrently with plaintiff's disbursement to its laborers, or defendants could release a sufficient portion of the retention money to cover the escalation payments until reimbursement was completed. (Tr. 50–51, 111–12).

The first source was not available to the plaintiff because the defendants had instructed Hart not to make any advanced payments for wage escalation payments. (Tr. 67). However, Hart did testify that the checks used by the plaintiff to pay the wage escalation payments were guaranteed at the bank by Kaiser in accordance with the Jamaican over-draft system and that the plaintiff's site manager knew of this. (Tr. 61, 90–91, 99). Carpenter testified that he personally had no idea that the checks were guaranteed. (Tr. 135). No other witness was presented by the plaintiff to clarify this matter.

The second source, the retention money, was the subject of Robertson's letter which was the first of the three letters to be received by Hart. Hart's response was to call Robertson and repeat to him the defendants' position that a release and waiver of liens was needed before the money would be released. (Tr. 13). This conversation was confirmed in a letter dated June 9, 1971 from Hart to Robertson:

"Your letters of February 26, 1971 and June 8, 1971, concern Release of

---

3. This letter was addressed to the attention of a Mr. C. D. Maxson but was immediately brought to Hart's attention. (Tr. 16).

Retention on subject Contract. You will recall that we have discussed this matter in several previous conversations. Exhibit 'C' Terms and Conditions for Contracts, Articles 23 and 25 clearly outline procedures precedent to final payment under this Contract. As you are aware, these conditions have not yet been met.

"Please be assured that once you have complied with the necessary conditions, Retention monies will be promptly released." (DX 6).

Hart next received Carpenter's letter of June 1, 1971 in which Carpenter had requested a meeting be set up to discuss relief for the plaintiff from the alleged losses sustained under the contract. Hart told Carpenter he would attempt to set up a meeting as soon as possible. (Tr. 14–15, 115). Hart also reminded Carpenter of the defendants' policy not to release any retention moneys under any circumstances until a clean release and waiver of liens was received. (Tr. 14).

Before receipt of the Sipes letter with Shea's release, a draft of a release and waiver of liens was sent to Robertson pursuant to Kaiser's normal procedure to send such drafts to contractors as a project nears completion. Directions on the draft to specifically list any claims were circled in red to draw attention thereto. (Tr. 15; DX 7).

On June 11, 1971 the plaintiff paid the wage escalation (Tr. 60–61; DX 15) although no explanation was given at trial of the source of money used except for Hart's testimony that plaintiff's checks had been guaranteed at the bank by the defendants.

On June 14, 1971 Hart received Sipes' letter with Shea's release. Hart told Robertson that the retention money still could not be released because the wording of the excepted claims was unsatisfactorily vague. (Tr. 17). Hart then called Carpenter and provided him with wording which would be satisfactory to

the defendants. (Tr. 17). During this conversation Hart and Carpenter also discussed the meeting requested by Carpenter. (Tr. 18, 117).

Carpenter thereafter advised and instructed Robertson to change Shea's release to conform with Hart's directions. (Tr. 116–17). Accordingly, the exceptions listed in Shea's release which read "Wage Escalation per Exhibit 'G' [and] Any and all insurance claims" were reworded to read: "Wage Escalation per Terms and Conditions of Contract." (Tr. 19; DX 11). Furthermore, the wording of the Shea release was altered to define the contract "as changed or amended through Change Order 'J' " instead of "through Change Order 'I' "[4] and monetary recitations in the release were altered to reflect the correct status of the plaintiff's account. (Tr. 18; DX 11).

This revised release was signed on June 14, 1971 by Robertson and hand carried to Hart the same day. (Tr. 18, 19; DX 11). Within two days nearly the full amount of the retention money was paid to the plaintiff, (Tr. 46, 47, 125, 128), and this money was sufficient to cover the plaintiff's wage escalation obligation, (Tr. 111, 125–26), which had been fulfilled on Friday, June 11.

Both Carpenter and Hart, the only witnesses who testified in person at trial, agreed that timely payment of the wage escalation was necessary to prevent violence at the plant site. (Tr. 131). Hart testified that had the wage escalation not been paid the laborers would probably have caused the plaintiff's project manager to be taken "off the island in a box." (Tr. 71). Carpenter agreed that if payment was not made "there could have been some real problems, real violent problems down there." (Tr. 125).

Carpenter also testified that he had no idea that the release would affect the meeting he had requested in his June 1 letter "to discuss some relief or means

4. On June 9, 1971, Charge Order "J" of the contract was issued. (Tr. 18; DX 10).

whereby our company can at least be reimbursed for the actual costs . . . through contract adjustment or future work" even though he had "filed no claims to date." (DX 5; Tr. 117, 124, 133, 146). Hart agreed that the release would not affect the meeting to the extent the meeting was owed Carpenter as a *courtesy* to see if there were any extenuating circumstances of which Kaiser was not aware. However, Hart did believe that the release precluded the plaintiff from filing any formal claims under the contract which were not excepted in the release and waiver of liens signed by Robertson. (Tr. 24, 76).

Neither Hart nor Carpenter discussed the effect the release would have on future formal claims, (Tr. 117), and at no time did the plaintiff attempt to except the claims presented in this suit. However, Carpenter did testify he had a lot of contract jobs before and knew what a release was. (Tr. 133). In fact, in a previous release of a contract for earlier work done on the defendants' plant, plaintiff executed a release expressly reserving a claim for "loss of productivity", (DX 20), the basis of the presently litigated claim.

B. *Conduct After Release Was Signed.*

On June 17, 1971 Hart sent a telex to Carpenter informing him that his meeting had been arranged for July 7, 1971 in Oakland, California with representatives of Kaiser and the defendants attending. (PX 1; Tr. 24, 118). Carpenter attended the meeting to ask for "an equitable contract adjustment." (Tr. 141). He was not presenting a formal claim, but instead was "trying to get enough information in their hands where they could come up and make some intelligent evaluation." (Tr. 142). At the meeting, Carpenter was told that his losses were due to mismanagement,

(Tr. 26), that the labor conditions complained of were not much different from those encountered on the original plant construction when plaintiff made money, (Tr. 26, 107–08), and accordingly, the personnel present at the July 7 meeting were not inclined to extend the "equitable" relief requested. (Tr. 27).[5]

Immediately after the July 7 meeting another meeting was scheduled for July 8 between Carpenter and Andy Kritscher ("Kritscher"), the "big boss" of Kaiser. (Tr. 78–80, 120). Having had his "equitable" request turned down the day before, Carpenter told Kritscher he had a problem with Kaiser and could not get it resolved. Kritscher is reported by Carpenter to have replied, "Mr. Carpenter, if you have a problem, a dispute, you submit a formal claim in accordance with the terms and provisions of the contract, and then I have something to talk to the Partners about." (Tr. 121). That terminated the July 8 meeting. (Tr. 121).

By letter dated July 22, 1971 Carpenter submitted a formal claim to Kaiser for additional supervisory costs, work acceleration costs, and losses due to poor labor productivity under the contract. (PX 5; Tr. 123).[6] The formal claim was sent to Hart in Jamaica, and Hart turned the formal claim over to the Kaiser offices in Oakland. (Tr. 89). The next response received by Carpenter was Kaiser's letter of August 3, 1971 stating that plaintiff's formal claim was barred by the June 14 release:

> "We have carefully reviewed your July 22nd letter and our files and find that a Release and Waiver of Lien was executed by Carpenter International, Inc. on June 14, 1971 settling all claims relating to the subject contract with the exception of a claim for 'Wage Escalation per Terms and Conditions of Contract.' A copy of this

5. A detailed account of the reasons why there was no sympathy for the plaintiff's cause is found in an inter office memorandum by Hart dated July 7, 1971. (DX 18). See also Tr. 85.

6. Letters dated July 14, 1971 to Kritscher (PX 3) and Hart (PX 4) notified Kaiser that a formal claim would be submitted.

Release is enclosed. As you will note, none of the items listed in your July 22, 1971 letter were reserved or excepted from the June 14, 1971 release. Accordingly, we have no alternative but to reject the claims set forth in your July 22, 1971 letter in their entirety." (PX 7).

The plaintiff was reimbursed for the wage escalation payment excepted in the release by a first check issued in July 1971, (Tr. 99), and a second check issued in December 1971. (Tr. 100). The small amount of retention money not released in June was released by a check dated December 14, 1971. (PX 8). The plaintiff brought the present suit in March 23, 1972 for the losses set out in the formal claim letter of July 22, 1971. (Docket Item 1).

## II. CONCLUSIONS OF LAW

Jurisdiction is conferred on this Court by 28 U.S.C. § 1332.

■ Since this is a diversity action, this Court is bound to apply Delaware's conflict of law rules, Klaxon Co. v. Stentor Co., 313 U.S. 487, 491, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941), which provide that the release is governed by California law since the parties both agree California law would apply (Docket Item 14, pp. 4–6; Docket Item 20, p. 16) and absent some compelling reason, Delaware courts abide by the intent of the parties. Wilmington Trust Co. v. Wilmington Trust Co., 26 Del.Ch. 397, 24 A.2d 309 (1942).

■ In *Carpenter*, 369 F.Supp. at 1141, this Court found that under California law the general rule is that a release whose language is clear and explicit, and does not involve absurdity becomes the agreement of the parties as a matter of law. The language of the release proffered by the defendants in this suit clearly and explicitly "hereby releases [the defendants] from any and all claims arising directly or indirectly under said contract . . . except for

. . . Wage Escalation per Terms and Conditions of Contract." (DX 11). The present action to recover costs incurred by the plaintiff to provide increased American supervision on the project and the losses incurred to offset low productivity of the labor force is a claim "arising directly or indirectly" under the contract but not for wage escalation pursuant to the terms of the contract. Neither does the release involve an absurdity. Thus, according to the general California rule, the release executed by the plaintiff is a bar to the present action.

### A. *Exception To Rule.*

In *Carpenter*, 369 F.Supp. at 1142, this Court noted an exception to the general California rule which provides:

". . . If the releaser was under a misapprehension, not due to his own neglect, as to the nature or scope of the release, *and* if this misapprehension was *induced* by the *misconduct* of the releasee, then the release, regardless of how comprehensively worded, is binding only to the extent actually intended by the releaser." [Emphasis added]. [Casey v. Proctor, 59 Cal.2d 97] 28 Cal.Rptr. [307], 310, 378 P.2d [579], 582 (Sup.Ct. en banc, 1963).

As a consequence, this Court now must determine: first, if Carpenter was under a "misapprehension" at the time he directed Robertson to sign the release that the present claims would not thereby be barred; second, if this "misapprehension" was not due to Carpenter's own neglect; and third, if this "misapprehension" was induced by the defendants' misconduct.

■ The plaintiff argues that Carpenter never intended the release to have any legal effect on the plaintiff's ability to assert the present claim. Plaintiff points to testimony by Carpenter that if he had known the release would have any effect on the claim in this suit he would not have directed the

release be signed[7] and testimony that he had no reason to put an exception in the release because a meeting was being set up to discuss a remedy to plaintiff's problems.[8]

However, Carpenter did admit that had he known Kaiser was going to turn down a formally submitted claim based on costs of increased supervision and losses due to poor labor productivity, then he would have excepted that in the release. (Tr. 153). Thus, Carpenter's only "misapprehension" as to the scope or nature of the release, if any, was that he believed if a request for relief had not yet been discussed at conference or a formal claim arising therefrom rejected, there was no need to except such a claim from the release, while full well understanding that if he knew a claim based on his request for equitable relief would be rejected if submitted, then he had to except that claim from the release in order to preserve it.

The sheer illogic of this position in view of Carpenter's experience in the construction business and his knowledge of the function of a release alone casts grave doubt on plaintiff's assertion that any such "misapprehension" existed. Coupled to that is the fact that the wage escalation payments were excepted from the release before any formal claim for them had apparently been rejected. Excepting these payments is inconsistent with Carpenter's alleged misunderstanding of the scope and nature of the release.

■ Furthermore, the magnitude of the claim involved here is in excess of half a million dollars and there is no assertion by plaintiff that the extent of

the alleged loss was unknown to plaintiff at the time the release was signed. Certainly plaintiff's personnel as experienced as they were with contracts and releases should have at least inquired of the impact the release might have on a possible future claim of that magnitude. Even if Carpenter were, as the plaintiff argues, lulled into believing the claim was preserved by the conduct of the defendants, the fact he did not confirm this belief by asking if the request for relief would be affected is in this Court's view attributable to plaintiff's own neglect.

■ However, even plaintiff's argument that defendants' misconduct lulled Carpenter into a misapprehension of the scope and nature of the release is untenable. First, the defendants in no way withheld any facts relating to the release or the meeting. The effect the release would have on any forthcoming claim was evident from the fact of the release itself. Second, the defendants repeatedly drew the plaintiff's attention to the pertinent language and effect of the release by making known their policy of requiring a full release, (Tr. 12), by verbally reminding Robertson that a full release was required, (Tr. 13), by expressly calling Carpenter's attention to contract Exhibit C, Paragraph 23 which at E provides a right to the defendants of requiring a general release, (DX 6, 19; Tr. 3), by a letter to the plaintiff which had directions circled in red to list any claims which were to be excluded, (Tr. 15; DX 7), by rejecting a proffered release because the wording of the excepted claims was not satisfactory, (Tr. 17), and finally by actually

---

7. "Q. . . . if you had known that that June 14 instrument would have had any effect at all on your request for a contract adjustment, would you have had that release signed?
A. No sir, I would have probably just said 'Adios' and we would have gone on down the pike." Tr. 124.

8. "Q. Why didn't you list them as an exception in that June 14 instrument?
A. I didn't have any reason to put them in there. As far as I knew, and what Mr.

Hart was telling me, we were working actively to establish a meeting, and a meeting was set up; there was never a formal action during 1967 and '69 when we settled over a half million dollars in claims, sometimes before sometimes after the fact. [A total of less than $5,000 was ever paid on a claim not excepted in a release. Tr. 28.] So it never occurred to us that we were releasing something prior to ever having a conference on it." Tr. 135. [Brackets added.]

providing the plaintiff with language which would be acceptable. (Tr. 17).

■ Third, plaintiff never drew defendants' attention to the fact that a formal claim might arise from the meeting. Instead, plaintiff, through Carpenter, requested a meeting "to discuss some relief or means whereby our company can at least be reimbursed for the actual costs . . . through contract adjustment or future work," (DX 5), and for a contract adjustment approved on "grounds of factual equity" being well aware that the request was "unusual." (DX 16). Even at the July 7 meeting Carpenter did not indicate an intention to present a formal claim, (DX 17), but rather he requested an "equitable" contract adjustment. (Tr. 141). The mere fact Hart could have warned Carpenter of the obvious effect the release would have on possible future formal claims does not in this Court's view amount to misconduct warranting revocation of a clearly worded release.

■■ Fourth, the fact that the released retention money may have benefited defendants by avoiding violence at their plant is stressed in the plaintiff's argument to the Court. However, there is no proof of record that the plaintiff was not obligated under the contract to pay the wage escalation regardless of who may have benefited. To the contrary, Carpenter repeatedly confirmed in his testimony the existence of plaintiff's obligation in this regard. (Tr. 125, 132, 150). In addition, plaintiff failed to prove any legal obligation of defendants to timely assist plaintiff with the payments, while Hart did testify that the defendants offered to provide assistance to plaintiff by guaranteeing the wage escalation checks. (Tr. 61, 90–91, 99). Thus, this Court finds that the defendants' refusal to reimburse plaintiff until an audit and proof of payment were complete has not been proved to be a misconduct which induced plaintiff into any misapprehension as to the effect of the release.

Accordingly, the Court finds that the plaintiff has failed to prove by a pre-ponderance of the credible evidence that the release was signed under a misapprehension as to the legal effect of the release, and that the plaintiff has failed to prove that even if there was such a misapprehension it was not due to its neglect, and finally that the plaintiff has failed to prove misconduct of the defendants which would warrant application of the California exception.

■ A logical inference which may be drawn from the facts is that Carpenter simply failed to consider that his June 1 letter and request would ever lead to a formal claim and, therefore, he had no reason to list any additional exception in the June 14 release. However, even if this failure can be said to be a misapprehension of the scope and nature of the release, it was due to Carpenter's own neglect and not any misconduct on the defendants' part. There is no evidence of record that the defendants gave the plaintiff any assurance that the requested meeting would lead to any financial relief satisfactory to the plaintiff. The fact that in the past the plaintiff believed that he had been treated fairly was no assurance satisfaction would be forthcoming in this instance. To the extent Carpenter failed to preserve the plaintiff's legal remedies because of past satisfaction, the Court finds the failure is a result of his own neglect and not the defendants' misconduct.

### B. *Waiver.*

■ The plaintiff also argues that the release was waived by the defendants' conduct after the signing which was inconsistent with an intention to enforce the release.

The facts of record simply do not support this position. The July 7 meeting in 1971 was not inconsistent with an intent by the defendants to enforce the release should a formal claim be asserted. As to that time no formal claim had been filed and the meeting was by Carpenter's own testimony merely an opportunity to get information into the defendants' hands. (Tr. 142). Further-

more, the Court finds Hart's testimony more reasonable and credible that the defendants had done business with plaintiff for a number of years and therefore believed that they owed it to the plaintiff to listen to what there was to be said. (Tr. 24). In short, the meeting was tendered to the plaintiff as a courtesy and did not open the defendants to any legal obligation contrary to the express provision of the release.

Having rejected plaintiff's equitable plea, the defendants extended Carpenter the additional courtesy of a meeting with Kritscher. The record reflects that Carpenter told Kritscher he had a problem with Kaiser but did not go into any detail. (Tr. 121). Kritscher wanted something formal to ascertain the situation and accordingly suggested that Carpenter follow the terms of the contract and submit a formal claim. (Tr. 121). The formal claim was submitted by letter dated July 22, 1971, (PX 5; Tr. 123), and was rejected formally on the ground that the June 14 release barred the claim. (Tr. 93; PX 7). Hart had testified that the formal claim was reviewed on the merits on an item by item basis but by on the "merits" Hart meant "whether we should consider the claim or not consider the claim." As a consequence it is not clear whether or not the defendants reviewed the substance of the formal July 22 claim to any greater degree than was necessary to ascertain whether the claim was barred by the release. Furthermore, even if the formal claim was evaluated without regard to the release, the Court finds that this, in consideration of all the factors in this case, is not sufficiently inconsistent with an intention to enforce the release so as to justify a finding that the release was waived.

C. *Estoppel.*

The plaintiff's final argument is that defendants are estopped from asserting the release. After recognizing that estoppel requires ignorance of the party who invokes the doctrine, a representation by the party estopped which misleads, and an innocent and deleterious change of position in reliance on that misrepresentation, the plaintiff asserts that estoppel applies in the following instances: *First,* when Carpenter was "induced" into entering the release for the defendants' "benefit" with the promise of a meeting to discuss plaintiff's need for relief; *second,* when Kritscher told Carpenter to prepare a formal claim with knowledge that such preparations would involve considerable time and expense; and, *third,* when Carpenter wrote to the defendants confirming he was in the process of preparing a formal claim and he received no response.

Estoppel does not apply in the first instance even if Carpenter were so induced because there was no misrepresentation; the meeting was held and the plaintiff's need for relief was discussed as promised. Estoppel does not apply in the second or third instances because the plaintiff has failed to satisfy the Court that Carpenter was ignorant at that time of the effect of the release and because preparation of the five page formal claim submitted by the plaintiff is not sufficiently deleterious considering the circumstances of this case to afford relief by estoppel.

In summary, the release is clearly on its face a bar to the claims asserted in this suit by the plaintiff. The facts surrounding the execution of the release do not warrant application of any exception under California law to alter the clear bar of the release. The facts surrounding the conduct of the parties after the release was signed do not warrant application of any doctrine of waiver or estoppel. Accordingly, the Court finds the release to be valid and binding as a bar against the plaintiff and judgment will be entered against the plaintiff and in favor of the defendants.

The above shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.